UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JERRY MACK MEADOWS and RHONDA MEADOWS, as Co-Administrators of the Estate of JERRY BRIAN MEADOWS, deceased, | ) ) ) ) ) |
| Plaintiffs, | ) No. 2:19-cv-00006 ) ) |
| v. | ) ) |
| PUTNAM COUNTY, TENNESSEE, et al., | ) ) ) |
| Defendants. | ) ) |

# MEMORANDUM OPINION

Before his death, Jerry Brian Meadows was an inmate in the Putnam County Jail. His parents as co-administrators of his estate filed this lawsuit under 42 U.S.C. § 1983 for deliberate indifference to his serious medical needs, excessive force, retaliation, failure to train, and state tort claims. Specifically, plaintiffs allege that Putnam County officials failed to provide adequate medical attention when Meadows' health condition deteriorated and used excessive force against Meadows. They bring this case against Putnam County, Tennessee; Sheriff Eddie Farris; jail administrator Tim Nash; corrections officer Cody Williams; Southern Health Partners, Inc., the jail's medical provider; and Kelly Nash, a nurse at the jail.

Before the Court are Motions for Summary Judgment by Putnam County and Farris, Nash, and Williams. (Doc. Nos. 51; 55).[1] Both motions have been fully briefed. (Doc. Nos. 52, 56, 62–67). For the following reasons, both motions will be granted in part and denied in part.

---

[1] The Court considers the motions as filed because, although the Second Amended Complaint (Doc. No. 81) supersedes the complaint that was operative when defendants filed these motions, the complaints are substantially identical as to these defendants. See Pethel v.

## I. FACTUAL BACKGROUND[2]

Following conviction and sentencing, Meadows was committed to custody at the Putnam County Jail on December 4, 2017. (Doc. No. 65 ¶ 4). Upon arrival, he was asked about any medical conditions and did not disclose any, even though he was previously diagnosed with human immunodeficiency virus ("HIV"). (Id. ¶ 2). Beginning on January 19, 2018, Meadows complained of severe, ongoing, and worsening head and neck pain. He received several medical assessments, including x-rays of his neck that were negative. (Doc. No. 64-2 at 1–3, 7).

On January 27, 2019, Meadows lost his balance and fell in the shower. The treating nurse recommended that he not be taken for emergency care. (Doc. No. 64-2 at 6). Later that day at visitation, Plaintiffs were alarmed by his limited ability to move and speak, which his mother thought made it look as if he had a stroke. (Doc. No. 64-3 at 2). Plaintiffs contacted Farris, who agreed to have Meadows taken to a hospital. (Doc. No. 64-1 at 2). Meadows was taken to the emergency room at Cookeville Regional Medical Center ("CRMC") that same day and diagnosed with sinusitis, prescribed medicine, and returned to the jail. (Doc. Nos. 65 ¶¶ 6–7; 51-4 at 19).

The next day Meadows had three seizures. He responded to ammonia tablets after the first two seizures but was again taken to the emergency room after his third seizure when he did not respond to ammonia tablets. He was diagnosed with epilepsy. He returned to jail later that day and was monitored overnight. (Doc. Nos. 65 ¶ 8; 64-2 at 7–9).

---

Washington Cty. Sheriff's Office, No. 2:06-cv-799, 20007 WL 2359765, *5 (S.D. Ohio Aug. 16, 2007).

[2] These fact, construed most favorably to Plaintiffs, are taken from the defendants' statements of material facts (Doc. Nos. 53, 57), and the plaintiffs' responses thereto (Doc. Nos. 63, 65).

The very next morning, January 30, Meadows was transported to the Bledsoe County Correctional Complex ("Bledsoe") to serve his sentence. (Doc. Nos. 64 ¶ 9; 51-13 at 2; 51-14 at 2). At around the same time, plaintiffs met with Farris to discuss Meadows' medical treatment. Farris attempted to have Meadows join the meeting but he had already left for Bledsoe. (Doc. No. 62-1 at 2).

Andrew McDermott, Phillip Tabor, and Jeremy Austin were inmates with Meadows on January 30 in his holding cell at the jail and then in the van to Bledsoe. They believe that Meadows was not well before he left the jail. According to them, Meadows could not stand or sit up, was incoherent, vomiting, and incontinent. Meadows in fact choked when trying to eat and McDermott had to perform the Heimlich maneuver. They reported that Meadows was ill, to which a corrections officer told them that nothing was wrong with him and "[s]oon he'll be [Tennessee Department of Correction]'s problem." A nurse briefly saw Meadows at the holding cell, but there is no documented medical record of care. (Doc. Nos. 64-5; 64-6; 64-7).

Williams was one of the corrections officers assigned to transport him. (Doc. No. 65 ¶¶ 9–10). Meadows was put in feet shackles and waist chains. He laid on the front row of seats because he could not sit himself up. McDermott recalled that Meadows was like "deadweight" in the van and the inmates all describe him as "incoherent," non-verbal, and visibly ill. (Doc. Nos. 64-5; 64-6; 64-7).

When Meadows placed his feet on the van door, Williams yelled at Meadows, "[d]on't make us pull over" and "[y]ou're going to regret it." The van stopped and Williams dragged Meadows out of the van by his feet. Meadows' head and body hit the van. (Doc. Nos. 64-5; 64-6; 64-7). Tabor saw Meadows "man-handled" as he was carried to a car and his head hit the car. (Doc. No. 64-6 at 3). Before arriving at Bledsoe, Meadows was taken out of the car and "forcefully

3

thrown" back into the van, hitting his head once again, this time against plexiglass in the van. (Doc. Nos. 64-5; 64-6; 64-7). Meadows was immediately taken to the infirmary at Bledsoe. (Doc. Nos. 65 ¶ 11; 64-8 at 2). He was "combative," "mentally impaired," and had "multiple abrasions on [his] entire body from county." (Doc. No. 64-8 at 2, 5).

The next morning, January 31, Meadows was rushed to the emergency room. He was unresponsive, intubated, and transferred to the intensive care unit. (Doc. Nos. 65 ¶ 11; 64-9 at 4, 6). There, doctors diagnosed Meadows with viral meningitis and brain death, possibly precipitated by "untreated HIV." (Doc. Nos. 65 ¶ 11; 51-11 at 1, 9). The family ultimately decided to withdraw life support and Meadows died on February 2, 2018. (Doc. No. 51-10 at 9; 64-10 at 2). An autopsy showed the cause of death was "cryptococcal encephalitis and meningitis," an infection in membranes covering the brain and spinal cord, due to HIV. (Doc. No. 51-11 at 1–2).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After this initial burden is satisfied, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. To survive summary judgment there must be evidence on which a

4

trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595; Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999).

## III. ANALYSIS

Plaintiffs bring this action under 42 U.S.C. § 1983 against Putnam County, Sheriff Farris, jail administrator Nash, and corrections officer Williams. "To prevail on a cause of action under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." Winkler v. Madison Cty., 893 F.3d 887, 890 (6th Cir. 2018) (quoting Shadrick v. Hopkins Cty., 805 F.3d 724, 736 (6th Cir. 2015)). Each defendant here is a "person" for purposes of Section 1983. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

### A. Deliberate Indifference

The Eighth Amendment governs medical treatment of inmates like Meadows. Estelle v. Gamble, 429 U.S. 97, 102–03 (1976). "'[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' that is violative of" the Eighth Amendment and provides a cause of action under Section 1983. Darrah v. Krisher, 865 F.3d 361, 367 (6th Cir. 2017) (quoting Estelle, 429 U.S. at 104). A plaintiff must meet two requirements to succeed on a claim of deliberate indifference, one objective and the other subjective. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). The objective element requires that the inmate have a sufficiently serious medical need. Winkler, 893 F.3d at 890–91. Meadows' diagnoses of seizures and cryptococcal encephalitis and meningitis were each unquestionably objectively serious medical conditions. Newberry v. Melton, 726 F. App'x 290, 295 (6th Cir. 2018) (concluding that "seizures resulting in bruises and cuts on his head, vomiting, and an inability to breath" were

objectively serious); Popoalii v. Correctional Medical Servs., 512 F.3d 488, 499–500 (8th Cir. 2008) ("Cryptococcal meningitis unquestionably is a serious medical condition").

The subjective component requires that a defendant "knows of and disregards an excessive risk to inmate health or safety." Winkler, 893 F.3d at 891. This is "greater than negligence or malpractice." Id. Indeed, "the evidence must show that the specific individual [defendant] was aware of facts from which he or she could infer a substantial risk of serious harm." Id. Substantial risk is a question of fact that may be demonstrated by "inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842)

1. **Individual defendants**

    a. Sheriff Farris and Jail Administrator Nash

Farris and Nash oversaw the Putnam County Jail while Meadows was incarcerated there. To the extent they were directly involved in the treatment of Meadows' medical needs, they may be liable individually. Winkler, 893 F.3d at 898 ("liability cannot be imposed on a supervisor under § 1983 based on the theory of respondeat superior" for the acts or omissions of another). Plaintiffs argue that Farris and Nash were individually involved in Meadows' medical care when plaintiffs met with Farris on January 27 and 30, and with Nash on January 27 through 30.[3] (Doc. Nos. 62 at 16).

This is not a case about Meadows HIV diagnosis because there is no evidence that any defendant had knowledge of his HIV status. Instead, plaintiffs' deliberate indifference claim rests upon the failure to treat Meadows' serious medical needs while in the jail. His medical symptoms

---

[3] On January 28 and January 29, Nash allegedly told plaintiffs he believed Meadows was on drugs and did not need medical treatment. (Doc. Nos. 64-1 at 2; 64-3 at 3–4). However, medical care was provided to Meadows on both days. (Doc. Nos. 65 ¶¶ 6–8; Doc. No. 64-2 at 7–8).

began on January 19 when Meadows complained of a severe headache. (Id. at 13–15). He received treatment, but plaintiffs maintain that Farris and Nash were deliberately indifferent to Meadows' medical needs by delaying treatment for his obvious serious medical need. (Doc. No. 62 at 17).

Delays in medical care for "known medical needs may constitute deliberate indifference." Darrah, 865 F.3d at 368. "Even relatively short periods of delay or neglect have sufficed." Id. (citing Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834, 844–45 (6th Cir. 2002) (one-hour delay in treatment)). However, plaintiffs have not shown an unreasonable delay by Farris or Nash once they became aware of Meadows' medical condition. Meadows first reported his head and neck pain to the jail's infirmary on January 19 and he was seen by nurses several times that day and over the coming days. (Doc. Nos. 62 at 13–15; 64-2 at 2). Farris or Nash allegedly became involved on January 27 when Meadows fell in the shower. Later that day at visitation, his family were so alarmed at Meadows' physical condition that they contacted Farris and Nash. Meadows was then transported to the hospital that same day. (Doc. No. 65 ¶ 6). There was no unreasonably delay by Farris and Nash after they became aware of Meadows' medical needs.

When Meadows had his first two seizures on January 28, he was treated by nurses in the jail. When he did not respond to ammonia tabs after his third seizure, he was taken by ambulance to the emergency room. (Doc. No. 64-2 at 7–8). Again, there was no delay in treatment for any of the three seizures. On this record it appears that Meadows received prompt medical care. There was no deliberate indifference by Farris or Nash between January 27 to 29.

Meadows was not provided medical care on January 30 when he was in a Putnam County Jail holding cell and his condition seriously deteriorated. At most, a nurse visited but did not provide a documented medical exam. The Sixth Circuit has held that "[w]hen the need for medical treatment is obvious, medical care which is so cursory as to amount to no treatment at all may

7

amount to deliberate indifference." Darrah, 865 F.3d at 370 (quoting Terrance, 286 F.3d at 843). Because of Meadows' deteriorating condition and new symptoms that morning, Putnam County Jail officers could no longer rely on the previous medical treatment. See Smith v. Cty. Of Lenawee, 505 F. App'x 526, 532 (6th Cir. 2012). Plaintiffs however offer no evidence that either Farris or Nash were aware of Meadows' deteriorating condition on January 30. Plaintiffs met with Farris on January 30. Farris called the jail and asked for Meadows, but he was already en route to Bledsoe. (Doc. No. 62-1 at 2). There is no evidence to infer that Farris knew of Meadows' worsening symptoms on January 30 before he left the jail. Winkler, 893 F.3d at 891.

Because prompt medical care was provided when Farris and Nash knew of Meadows' medical problems, reasonable jurors could not find that either Farris or Nash were subjectively aware of Meadows' medical needs and yet disregarded them. They are entitled to summary judgment.

b. Officer Williams

Officer Williams' involvement is limited to the transportation of Meadows from the jail to Bledsoe on January 30, 2018. Based on the report of the inmates, Meadows was ill that day. Meadows' behavior in the van—lying down, putting his feet against the door, not responding to a correctional officer—was odd but, to Williams, it may not have been unusual behavior from other, healthy inmates. It is unclear whether Williams was subjectively aware of Meadows' medical needs. As the Court of Appeals has explained, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Winkler, 893 F.3d at 898 (quoting Farmer, 511 U.S. at 838).

Moreover, even if Williams perceived that Meadows needed medical care, he did not demonstrate deliberate indifference by continuing to Bledsoe. At most, Williams may have been negligent for continuing to Bledsoe for Meadows to receive medical care in the prison's infirmary instead of diverting to an emergency room, but mere negligence is not sufficient to meet the high deliberate indifference standard. See Winkler, 893 F.3d at 891. Plaintiffs have not presented enough evidence from which a reasonable jury could find that Williams was deliberately indifferent to Meadows' medical need. Williams is entitled summary judgment on this claim.

### 2. Municipal defendants

Plaintiffs also bring a claim against Putnam County. (Doc. No. 64 at 22–23). Municipalities are only responsible for "their own illegal acts." Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986). "A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013) (citing Monell, 436 U.S. at 694).

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

Id. (citing Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).

The County argues that summary judgment should be granted because it does not have a policy or custom to provide inadequate medical care. (Doc. Nos. 55 at 3; 56 at 18–19). Plaintiffs argue that the County should be held liable because overcrowding and the actual treatment of Meadows shows a policy of denying proper medical care to inmates in the Putnam County Jail. (Doc. No. 64 at 23–24). They rely on two known deaths at the Putnam County Jail "in recent years"

9

and a newspaper article about a new medical provider for the jail with a statement by Farris that this change will increase the jail's internal medical capacity. (Id. at 24; Doc. No. 64-12).

Plaintiffs' assertions of overcrowding and improved medical capacity do not equate to a custom or policy of inadequately caring for prisoner's medical needs. A prison can be both overcrowded and still provide care for prisoners. See also Agramonte v. Shartle, 491 F. App'x 557, 560 (6th Cir. 2012) ("overcrowding is not, in itself, a constitutional violation"). Previous poor medical care is not shown simply by a change in the contracted medical care provider. There is no rule against a county changing medical providers to improve inmate medical care. Plaintiffs have failed to come forward with evidence of a policy or custom that was a moving force behind the treatment of Meadows. Burgess, 735 F.3d at 478.

Plaintiffs also seek to attach municipal liability because Putnam County failed to adequately train or supervise its employees. For this, plaintiffs must prove: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Winkler, 893 F.3d at 902 (quoting Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006)). Plaintiffs present no proof of any training inadequacy derived from the municipality's deliberate indifference.

Deliberate indifference in training requires proof of either a (1) failure to train "in light of foreseeable consequences," or (2) failure to train "in response to repeated complaints of constitutional violations." Id. (quoting Ellis, 455 F.3d at 700–01). There is no evidence here of any previous instances—"repeated complaints"—of inadequate inmate healthcare at the jail and it has not been shown that deliberate indifference was involved in the death of the other inmates.

Deliberate indifference based on foreseeable consequences only applies "in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." Id. at 903 (quoting Shadrick, 805 F.3d at 739). Plaintiffs do not identify what specific medical training "tools" should have been provided to jail personnel. Id. Summary judgment will be granted for the County.

**B. Excessive Force**

Plaintiffs also allege that Williams used excessive force against Meadows during the transportation from the Putnam County Jail to Bledsoe on January 30, 2018. Williams denies this claim, asserting he only used reasonable force due to Meadows' belligerence. (Doc. No. 52 at 20). He also asserts qualified immunity because any use of force did not violate clearly established law. (Id. at 23). The Court disagrees with both arguments.

Qualified immunity shields government officials from civil liability unless they violate a person's clearly established rights. Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). To be entitled to qualified immunity, the court must determine (1) whether the facts alleged show that the defendant's conduct violated a constitutional right, and (2) whether the constitutional right violated was "clearly established." Pearson v. Callahan, 555 U.S. 223, 232 (2009); Richmond v. Huq, 879 F.3d 178, 196 (6th Cir. 2018). A legal principle is clearly established if there is then-existing precedent "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." District of Columbia v. Wesby, 138 S. Ct. 577, 589–90 (2018).

It is well established that the Eighth Amendment protects convicted inmates from "unnecessary and wanton infliction of pain." Hope v. Pelzer, 535 U.S. 730, 739 (2002). There is an objective and subjective component to an Eighth Amendment excessive force claim. Id. The subjective component asks whether "force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm." Cordell v. McKinney, 759 F.3d 573, 580 (6th Cir. 2014) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)). This determination requires an evaluation of "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Hudson, 503 U.S. at 8 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).

There is a material dispute of fact over what force Williams used on January 30. Williams believes that Meadows was "belligerent and appropriate steps were taken to bring him under control," including removing him from the van. (Doc. No. 51-15 at 2). Williams points out that when Meadows arrived at Bledsoe, he was "combative," which was apparently a symptom of his deteriorating medical state. (Doc. Nos. 51-8 at 4; 51-10 at 8). Plaintiffs offer affidavits of three inmates in the van with Meadows who state that Williams was visibly ill, "dead weight," nonverbal, and not being disruptive. Nonetheless, Williams dragged him out of the van, hitting his head and body against the van and car. (Doc. Nos. 64-5 at 4–5; 64-6 at 3–4; 64-7 at 3–4). While "not every shove or restraint gives rise to a constitutional violation," Cordell, 759 F.3d at 580, Williams' alleged manhandling of a limp Meadows may. A reasonable jury could find that Williams objectively and subjectively exerted "unnecessary and wanton infliction of pain." Meadows' right to be free from "gratuitous[] assault[]" was clearly established at the time of the alleged violation on January 30, 2018 and Williams is not entitled to qualified immunity at this time. See, e.g., Coley v. Lucas Cty., Ohio, 799 F.3d 530, 540 (6th Cir. 2015) ("assaults on subdued, restrained and nonresisting detainees, arrestees, or convicted prisoners are impermissible").

A jury must decide this factual dispute.

### C. Retaliation Claim

Plaintiffs claim that defendants retaliated by denying medical treatment. The retaliation was allegedly for his families' repeated requests for medical intervention, his previous drug use, and for "faking" his symptoms. They have not shown a claim for retaliation, however. The elements of a retaliation claim are:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct.

Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

The Defendants provided Meadows with medical care directly after his family members asked Farris and Nash to do so, showing there was no adverse action taken in retaliation for the protected speech. Id. The defendants did not violate Meadows' First Amendment rights and the Court will grant summary judgment on this claim.

### D. State Law Claims

Turning to claims presented under Tennessee law, plaintiffs assert a claim for assault and battery, but the analysis that claim entails mirrors the excessive force claim. Griffin v. Hardrick, 604 F.3d 949, 956 (6th Cir. 2010). Because the Court determines that a genuine issue of material fact exists as to whether Williams committed excessive force, it will also deny the motion for summary judgment on the assault and battery claim against Williams.

The other state law claim is under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29–20–21, et seq. Plaintiffs assert that the County waived immunity under the TFTLA for claims of negligent hiring, assault, and battery. At this point, there are no remaining federal claims against the County. There is a "clear preference that [TGTLA] claims be handled by [Tennessee's] own state courts." Gregory v. Shelby Cty., Tenn., 220 F.3d

433, 446 (6th Cir. 2000); <u>Arbuckle v. City of Chattanooga</u>, 696 F. Supp. 2d 907, 928 (E.D. Tenn. 2010).

Title 28 U.S.C. § 1367 provides the federal district courts with supplemental jurisdiction over all claims related to those that are within the court's original jurisdiction in the same action. A district court may however decline supplemental jurisdiction "in exceptional circumstances" where "there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). The TFTLA's preference for resolution in state courts is a compelling reason and the Court will decline to exercise supplemental jurisdiction over this claim.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE